I8EHRodS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                      16 Cr. 644 (KBF)

JESUS RODRIGUEZ JIMENEZ,

                                      Sentence
          Defendant.

------------------------------x

                               New York, N.Y.
                               August 14, 2018
                               1:05 p.m.

Before:

                  HON. KATHERINE B. FORREST,

                               District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
NOAH FALK
     Assistant United States Attorney

LOUIS V. FASULO
JEFFREY COHN
GUADALUPE VALENCIA
     Attorneys for Defendant

ALSO PRESENT:   DAVID BEHAR, Special Agent DEA
                 MARK LANG, Special Agent DEA
                 ERIKA DE LOS RIOS, Interpreter (Spanish)
                 MARCIA GOTTER, Interpreter (Spanish)

I8EHRodS

1          (Case called)

2          MR. FALK:  Good afternoon.  Noah Falk, for the

3     government.  With me at counsel table is Special Agent David

4     Behar and Special Agent Mark Lang of the DEA.

5          THE COURT:  All right.  Good afternoon, folks.

6          MR. FASULO:  Good afternoon.  Louis Fasulo, Fasulo

7     Braverman & DiMaggio, along with my client, Mr. Rodriguez.

8          MR. VALENCIA:  Guadalupe Valencia, on behalf of

9     Mr. Rodriguez.

10          MR. COHN:  Jeffrey Cohn, also on behalf of Mr.

11     Rodriguez.

12          MR. FASULO:  Just for the record, also at the counsel

13     table is my paralegal Icelsa Gonzalez.

14          THE COURT:  I recognize Ms. Gonzalez from several

15     proceedings.

16          Mr. Valencia, have you filed a notice of appearance?

17     You have?

18          MR. VALENCIA:  Yes, your Honor.  I appeared at the

19     first hearing, and I filed a notice back then.

20          THE COURT:  Terrific.

21          MR. VALENCIA:  Thank you, your Honor.

22          THE COURT:  The Court notes that Mr. Rodriguez is here

23     and present.

24          We're here today for the sentencing of Mr. Jesus

25     Rodriguez-Jimenez, and I want to make sure that I state a

I8EHRodS

 1    couple of things on the record which indicates why we are here

 2    in August of 2018 for a plea that occurred back in September of

 3    2017.

 4              Mr. Fasulo.

 5              MR. FASULO:  I'm sorry, Judge.  I just want to put on

 6    the record the interpreter part.  We have the interpreter and

 7    Mr. Rodriguez can hear.

 8              THE COURT:  Sure.  Yes, there is a Spanish interpreter

 9    for Mr. Rodriguez.  I see that you're wearing the equipment,

10    sir.  Can you hear the translation?

11              THE DEFENDANT:  Yes.

12              THE COURT:  All right.  If at any point in time you

13    can't hear the translation or if you don't understand something

14    that's being said, just make a motion or indicate it to one of

15    your attorneys or make a motion to me, and we'll get that fixed

16    immediately.  All right?

17              THE DEFENDANT:  OK.

18              MR. FASULO:  Thank you, Judge.

19              THE COURT:  Thank you.

20              I wanted to set forth for the record why we are in a

21    sort of an unusual position where the plea occurred quite a

22    long time ago, but we're sentencing Mr. Rodriguez only right

23    now.  The reason for that is there had been a period of time

24    that extended, as I understand it, until late into the spring

25    when there had been a series of proffers by

I8EHRodS

1   Mr. Rodriguez-Jimenez looking towards the possibility of a

2   cooperation agreement.  That did not result in a cooperation

3   agreement.  All of that, the back and forth on the proffers, is

4   set forth in the filings, and so I wanted to just indicate that

5   that really took up a substantial chunk of time.

6            As a result, Mr. Jesus Rodriguez-Jimenez has been in

7   custody for almost two years at this point, since 2016.  The

8   PSR actually has the exact timing, so I don't want to, yes, get

9   it wrong.  He was arrested in Nevada on July 1, 2016, and then

10  transferred to federal custody in the Southern District on

11  July 27, 2016.  So it has been actually a little over two

12  years.

13           The way that I typically start these proceedings is to

14  set forth for the record the counts of conviction and then also

15  the materials that I've received and make sure that I've got

16  what you folks think I should have.

17           Mr. Cohn.

18           MR. COHN:  Yes, your Honor.  Just in conjunction with

19  what your Honor said about the timing and to complete the

20  record as regards to the timing of today's proceeding, the

21  sentencing, we put in a request for an adjournment on, I

22  believe, July 30, a day or two -- or maybe it was the 29th, a

23  day or two before our submission was due, our initial

24  submission.  The reason for that request was that pursuant and

25  as a result of these proffers that your Honor referred to,

I8EHRodS

1    there was some evidence or materials generated which we sought

2    to have an expanded period of time to evaluate.  There were

3    reams, many pages of documents Mr. Rodriguez-Jimenez provided

4    to the government and the recordings of consensual

5    conversations that he made under the supervision of the DEA.

6    It was our intention and contention that these materials were

7    relevant to basically proving the value of the assistance he

8    was providing, despite some earlier misstarts in his

9    cooperation.  Your Honor denied that request without

10   explanation.

11          And just to complete the record, because it has now

12   ripened into, as your Honor can see in the filings, a bone of

13   contention about the value of that, we'd like your Honor to put

14   on the record the reason for the denial of that when we only

15   received those materials the day that we filed the request.

16          THE COURT:  Yes, I have no problem stating why it is

17   important to sentence an individual in a timely way.  I think

18   that the sentencing here has gone on -- Mr. Rodriguez-Jimenez

19   pled guilty almost a year ago, and not sentencing him now

20   gravely concerns the Court.  In fact, sentencing him in August

21   gravely concerns the Court.  I wish I had sentenced him as soon

22   as the proffer sessions had ended, but the PSR process takes

23   some time.

24          I am not ever particularly concerned with why the

25   government chooses or does not choose to engage in a

I8EHRodS

1    cooperation agreement.  That's a prosecutorial decision that

2    they are entitled to make; and, therefore, the government is

3    fully entitled to have made a determination that, in its view,

4    the information was not reliable.  That's a unilateral decision

5    which it's entitled to make.  Frankly, the basis for my

6    decision on sentencing relates to the conduct of conviction and

7    not to the various matters that were or were not raised during

8    the proffers in terms of the materials that were at issue in

9    your letter.

10            Therefore, investigation, further investigation into

11   those materials is really an irrelevancy in terms of this

12   Court's ultimate sentencing determination, and a delay and an

13   adjournment would therefore not have been something which was

14   in the interests of justice.  However, we'll go through a

15   couple of things to just make sure that there is no need for a

16   *Fatico*.  I'll be clear that I don't believe there is because I

17   think that where I see the points of dispute are things upon

18   which I need not rely in order to reach a sentencing

19   determination and do not intend to rely.  But if something

20   comes up that you believe, Mr. Cohn, does require a *Fatico*, you

21   should make sure that we state it.  But, again, it is not a

22   sentencing issue for the Court that the government has

23   unilaterally chosen not to engage in a cooperation agreement.

24   That's just their prerogative.

25            MR. COHN:  Thank you, your Honor.

I8EHRodS

1          Just to complete the record on that, our position is

2     that the materials that we were pressed in time to evaluate

3     were relevant under Section 3553(a) factors.  I believe there

4     have been appellate decisions in which the higher courts have

5     said, in substance, a failed cooperation, to paraphrase, can be

6     used as a 3553(a) factor, and these materials that we sought

7     time to review, we believe, would have been materials that we

8     could have used had we had the time requested to make more full

9     arguments on 3553(a).

10          THE COURT:  Let me then assuage your concern this way,

11     which is I accept fully and I do take it into consideration and

12     have taken it into consideration that the defendant was

13     proffering actively and met with the government on a number of

14     occasions.  I accept that.  I take that into consideration.  I

15     think that it is important to note, for the record, that the

16     Court has considered that as a mitigating factor in terms of

17     the overall conduct.

18          So do not concern yourself that the Court somehow

19     undervalues or devalues his cooperation.  The fact, however,

20     remains that he did not ultimately end up in a position where

21     he has a 5K agreement or a cooperation agreement with the

22     government that resulted in a 5K letter.  That is, again,

23     something to the unilateral discretion of the prosecution.  So

24     it is not a matter of any inability to raise a 3553(a) factor.

25     There are a number of areas already set forth in the defense

I8EHRodS

submission as to areas of proffer with which the government

hasn't taken issue.  There are, however, a couple of points of

dispute.  Primarily the one that I want to explore is the time

frame of the unlawful conduct.  That, I think, actually comes

out through the PSR because the PSR itself has the time frame

in it, and so that may resolve any issues.  But the fact of

potential proffering and of a number of areas that may have

otherwise been useful to the government in some ways, but

ultimately, the inability or decision by the government not to

give cooperation, I think, is in their discretion.

So it's not that I'm not taking it into consideration

and giving the defendant credit for it.  I certainly am.

That's why, and the only reason why, I would allow a sentencing

to have gone on and have taken this long.  In fact, my normal

practice, of course, is to sentence defendants almost

immediately after receiving the PSR and getting the

information.  I would almost never have allowed a sentencing to

have gone on this long.  The reason for it was because we

actively ensured that we were monitoring that there were

ongoing proffers.  So for those reasons, I am confident that we

are able to proceed today without issue.

I also will note that I have a familiarity with this

record and familiarity with this overall matter.  As you folks

know, I sentenced Mr. Urbina.  I also was the judge who

presided over the deferred prosecution agreement.  We've had a

I8EHRodS

1    number of proceedings.  So it is useful for me to now complete

2    the process, given my particular information on this.  So let's

3    go and go through the various things that I would like to do

4    right now which relate to the counts of conviction and what

5    I've received.

6         Count One, the defendant pled guilty to two counts, to

7    Count One, which carries a ten-year maximum sentence, and Count

8    Three, which carries a 20-year maximum sentence.  Count One is

9    a conspiracy to engage in monetary transactions in criminally

10    derived property, and Count Three is concealment money

11    laundering.

12         Now, there are several submissions that I've received

13    in connection with this proceeding:  A defense submission dated

14    July 31, 2018, attached to which are a number of letters.

15    Actually, altogether, between that and the August 8, 2018,

16    submission are several dozen letters.  There's also a sealed

17    submission dated August 12, 2018.  The government then made a

18    submission dated August 7, 2018, and a second submission

19    responding to the August 12 submission from the defense.  That

20    second government submission is August 13, 2018.  The Court is

21    working with the presentence investigation report that is dated

22    May 7, 2018.  That is a revised report based upon the

23    objections that had been received to date.

24         Let's start with whether there are other materials

25    that I should be looking at that you folks believe you have

I8EHRodS

1   submitted in connection with this proceeding at this point.

2   Mr. Falk?

3            MR. FALK:  That's all from us, your Honor.

4            THE COURT:  Mr. Cohn?

5            MR. COHN:  Nothing else from the defense, your Honor.

6            THE COURT:  All right.  Then let's go through the PSR

7   and determine whether there are any objections to the factual

8   statements in the PSR.

9            As you folks understand, the Court does not adopt a

10  sentencing recommendation from probation.  That's not part of

11  what the Court adopts and incorporates by reference.  The Court

12  right now is focused on the factual statements in the PSR and

13  whether there are objections to or modifications that you folks

14  believe need to be made to the PSR.  The Court reviews a

15  sentencing recommendation from probation, but ultimately the

16  Court is required to and does make its own independent

17  sentencing recommendation -- sentencing decision for every

18  defendant based upon a review of a variety of things, including

19  sentencing recommendations from counsel as well as probation.

20           Mr. Falk, are there any objections to or modifications

21  that you believe need to be made to the PSR?

22           MR. FALK:  Not from the government.

23           THE COURT:  All right.  Then let me ask Mr. Cohn, have

24  you reviewed the PSR with your client?

25           MR. COHN:  I have, your Honor.

I8EHRodS

1          THE COURT:  Do either you or your client have any

2   objections to or modifications to be made to the PSR?

3          MR. COHN:  No, your Honor.

4          THE COURT:  Was the PSR translated for your client?

5          MR. COHN:  Yes, your Honor.

6          THE COURT:  The Court then does adopt the factual

7   statements set forth in the PSR.  The PSR will be made part of

8   the record and filed under seal.  If an appeal is taken, then

9   counsel on any appeal may have access to the PSR without any

10   need for further application to the Court.

11          Now, let's talk about the one issue that I think is

12   something that I want to make sure that I am able to reference

13   in my sentencing determination, which is what I think is

14   important to take away in terms of the time frame of the

15   defendant's conduct.  I do understand that during the proffer

16   session there was one time frame that was referenced and that

17   the government takes issue with the more recent statements in

18   the defense submission about a different time frame.  And we'll

19   get to the guidelines in a moment, by the way, I haven't

20   forgotten about those.

21          It is my view that what's important are two things

22   which don't require me to land on a particular date.

23   Therefore, I don't believe that it's necessary for me to

24   determine whether or not it's 2011 or 2015.  Those two things

25   are the following:  (1) That the defendant as part of his plea

I8EHRodS

1    agreement agreed to forfeit the proceeds traceable to the

2    offenses of conviction in the amount of $284 million.  That

3    amount is suggestive of a particular ongoing set of criminal

4    conduct.  I am content to have it be a couple of years.  That

5    to me is sufficient.  I don't need to necessarily get down to

6    the nitty-gritty of whether it was a six-year period or a

7    five-year period.  The $284 million gives me an array, an

8    indication as to the magnitude of the conduct.  The date is

9    simply a proxy for magnitude; and, therefore, I don't think

10   that we should tarry on the date.

11           I also would note that there are indications in the

12   PSR that the conduct was at least as of, in terms of the

13   overall conspiracy, 2013.  I would look at paragraphs 19 *et*

14   *seq.* for that information, though a variety of the more

15   specific conduct, which I'm focused on for Mr. Jesus

16   Rodriguez-Jimenez, is 2014/2015.  That's really what I was

17   focused on.  Otherwise, while there is more detail in terms of

18   the government submission and the defense submission, my

19   takeaway is not to get into the nuances of those submissions,

20   apart from really focusing on what's in the PSR.

21           Let me ask, Mr. Falk, does the government have any

22   issue with the Court proceeding in that manner?

23           MR. FALK:  We don't, your Honor.  I think that that

24   approach makes a lot of sense, and the government agrees that,

25   really, the key number here is the forfeiture number of

I8EHRodS

$284 million which, in the government's view, reflects a

long-running scheme regardless of whether it began in 2011 or

2013.

THE COURT:  Let me ask, then, defense counsel, do you

have any problem with me proceeding in that manner?

MR. COHN:  Not only do we not have any problem, but as

I will make clear in our sentencing remarks, nothing in our

submissions was meant to dispute the admissions that

Mr. Rodriguez made in the proffers, and I'll expand upon that

later.

THE COURT:  OK.

MR. COHN:  Not only do we not have a problem, in

essence, with the time frame in the beginning, we're in

agreement with the government.

THE COURT:  So I can lose the 2011 date, it sounds

like.

MR. COHN:  That's correct.

THE COURT:  All right.  That eliminates that.  I don't

view the other particular factual matters where there are

disputes between the submissions as important or underlying the

Court's sentencing determination in any way.  I really am

focused on those matters as to which the PSR has the factual

statements, and we'll hear what Mr. Cohn has to say during his

sentencing remarks for further details where there may be no

points of dispute.

I8EHRodS

```
1          Then the guidelines.  I don't think we should also
2    spend any time really on the guidelines.  There were guidelines
3    set forth at the time of the plea that were in excess,
4    effectively, of the statutory maximum.  That under the
5    guidelines brings it down to, pursuant to the guidelines, the
6    statutory maximum of 360 months.  Therefore, while there are a
7    number of ways in which we could slice and dice certain
8    enhancements or not and we could talk about whether there was,
9    in the government's view, a need for withdrawal of acceptance
10   of responsibility or obstruction of justice, I don't think we
11   have to get to any of that because the way in which the
12   guidelines were calculated as part of the plea agreement put us
13   at the same point as probation.
14          The Court is content with what probation has done,
15   which essentially brings it down to 360 months, because the
16   guidelines otherwise would be at a level that exceeds the
17   statutory maximum.  So I don't think that there's any need to
18   go into the disputes that the parties might otherwise have with
19   particular pieces of a guidelines calculation that otherwise
20   could be done.  In other words, in short, the Court is content
21   to adopt the guidelines calculation as set forth in the plea
22   agreement.
23          Any dispute with that, Mr. Falk?
24          MR. FALK:  No.  That works for us, your Honor.
25          THE COURT:  Mr. Cohn, any dispute with that?
```

I8EHRodS

1              MR. COHN:  No, your Honor.

2              THE COURT:  The Court, then, does confirm the

3     guideline calculation as 360 months, which is the statutory

4     maximum sentence.  I therefore eliminate any disputes relating

5     to the guidelines that might otherwise be brought forward on

6     any appeal.

7              Let's go ahead and turn our attention to really what

8     is the main point of getting beyond those first preliminary

9     matters, which is to talk to folks about what you would like to

10    have my attention be focused on here today.  The way I start is

11    with the government; then defense counsel; then if the

12    government needs to comment, they can comment; and then

13    ultimately the defendant, if he would like to address the

14    Court, gets the last word in my courtroom.

15             Let's start, then, Mr. Falk, with you.

16             MR. FALK:  Thank you, your Honor.

17             The government wants to bring to the Court's attention

18    just the incredible seriousness of the conduct at issue here.

19    In the government's view, this scheme, which was long running

20    whether the Court credits the defendant's view that it began in

21    2015 or the government's view that it began in 2011, whatever

22    the case, it was --

23             THE COURT:  They're now agreeing with you that it can

24    be 2011.  I think that Mr. Cohn has eliminated that as a basis

25    for a factual dispute.

I8EHRodS

1           MR. FALK:  Well, I will take that.

2           But in any event, it's just incredibly serious

3     conduct.  We're talking about essentially the defendant was the

4     CEO of a shadow banking network that facilitated the

5     distribution of massive amounts of narcotics, among other

6     criminal activity, in over three continents.  And he leveraged

7     a web of shell corporations, couriers, and other seemingly

8     legitimate businesses and devices in order to facilitate

9     essentially a banking network for narcotics traffickers.  It

10    allowed their activity to occur on a massive scale, and I don't

11    think anybody in the courtroom would dispute the indelible harm

12    that that level of narcotics trafficking causes to communities,

13    both here in the United States, in Mexico, in Europe, and

14    throughout the continents that were touched by the defendant's

15    conduct.  All told, the defendant acknowledged that his

16    laundering network facilitated the laundering of over

17    $300 million in narcotics and other criminal proceeds.

18          So, really, that conduct, that is what I would like to

19    focus the Court on.  It seems to me that the statements that

20    were made in the defendant's sentencing submission indicating

21    that he thought that it was OK to engage in this kind of

22    conduct because he never touched drugs, he just touched the

23    money, those minimizations should not be credited by the Court.

24    The government has had a lot of opportunity to debrief the

25    defendant.  We've heard a lot from him, and as we have laid out

I8EHRodS

1    in our submissions to the Court, it's clear to us that the

2    defendant is incapable of consistent honesty, is incapable of

3    understanding the scope of the damage that this enterprise has

4    caused, and that a significant sentence is warranted in light

5    of the severity of the conduct.

6           If the Court has any questions for me, I'm happy to

7    respond; otherwise, I will rest on the submissions.

8           THE COURT:  Thank you.

9           I think right now I do not have any additional

10   questions.  Let's just hear from Mr. Cohn.

11          MR. COHN:  Yes, your Honor.  First, to address what

12   Mr. Falk said, I think right there you can see one of the

13   problems that we've been experiencing.  In the run-up to our

14   remarks right now, I conceded that the conduct started in 2011

15   because my client conceded that, and that's in fact what

16   happened.  Mr. Falk just stood up and again tried to say that

17   we were perpetrating, in essence, in practicality, an untruth

18   by saying it was 2015/2016.  It's that kind of lack of

19   intellectual rigor which I think has caused a lot of disputes

20   in this case.

21          First of all, to address the government's letter of

22   2013, of August 13, yesterday, that's where a lot of that comes

23   from.  It misapprehended our August 12 submission.  I never

24   said that the conduct was one to two years.  What I said was

25   that, in the government's August 7 submission and in fact in

I8EHRodS

1     the PSR, they were talking about a long-running conspiracy

2     without going into the facts underlying those adjectives.  That

3     is a fault in the logic of a submission, not a dispute of the

4     facts of the submission.  I was not saying it was a one- to

5     two-year conspiracy.  In fact, my actual wording in my

6     submission was it was a confused narrative that apparently

7     relied on it.  And I invite the Court and Mr. Falk to point out

8     to me in their August 7 submission whether they went into

9     anything before 2015.

10           So the point was not that this was a one- or two-year

11    conspiracy.  Obviously, our client admitted it started in 2011,

12    and he should be credited with that.  The point was in their

13    August 7 submission, they kept saying long running, long

14    running, but when it came time to talk about dates, they only

15    talked about 2015 to 2016.  And I think that is a hallmark of

16    the submission.

17           The other thing that Mr. Falk said again in his

18    remarks and talked about in yesterday's submission was somehow

19    that there was a dishonesty by Jesus in saying that his

20    rationale for getting into this was that he was never touching

21    the drugs.  Well, there is no drug dealing or involvement in

22    drug dealing by Jesus between 2011 and 2014 directly.  He did

23    admit on two occasions, after being in business with these drug

24    dealers for three years, that he did allow his trucks and made

25    money from moving drugs on two occasions, but in the context of

I8EHRodS

a six-year -- five-year, actually, group of activity, to say

that I got into it initially by deceiving myself that I was not

involved with drugs, that doesn't make him a liar that three

years later he did drug deals which he candidly admitted he did

for money.

          Getting back to what I know is your Honor's main

point, the conduct and the appropriate sentence, the conduct in

the PSR, the PSR does not mention Jesus until, I think, about

ten or 15 paragraphs into the conduct, the offense conduct in

this case.  And when it does mention him, it only mentions him

in relation to nonviolent money transactions because, really,

your Honor, that's as much as the conduct, which I know your

Honor wants to focus on, who no one disputes is very serious,

it is very serious conduct, but what we're really talking about

here is what does that conduct mean as far as what sentence is

necessary and not greater than necessary?  If you really

analyze that part of 3553(a), there needs to be some, in a

court, evidentiary support for the sentence that the government

is asking for, some anecdotal evidence, some social science

evidence.  Why is this sentence, which is an extremely heavy

sentence for a first-time, nonviolent offender, why is that

necessary?  Is there any reason to believe, based on everything

we all know about the way the criminal justice system works,

that long sentences equate to deterrence specifically,

deterrence generally?  There's nothing.  There's really nothing

I8EHRodS

1    that we can point to that says that this amount of time, or

2    anything close to it, is necessary, which is the mandate of

3    3553(a).

4           Now, the PSR, which I know your Honor wants to focus

5    on, has in accord with our submissions the facts that this is a

6    man who will be 48 years old tomorrow.  The letters, your

7    Honor, describe the same fact pattern time after time.  He

8    helps people get education.  He takes care of children for whom

9    he has no moral responsibility.  This is the person that you're

10   sentencing, your Honor.

11          I know the conduct is serious.  I'm going to repeat it

12   as much as I have to because we don't deny that, but that's not

13   the only thing.  I submit to you there is a host of other

14   factors where, even if they're not equal in importance, are

15   very important under the framework of 3553(a): nonviolent

16   first-time offender; a man who's filled his life, according to

17   the dozens of letters, with good deeds.  We had 27 or 23 items

18   of assistance which the government itself characterized in its

19   letter yesterday as significant, that they didn't dispute.

20          By the way, your Honor, some of those documents that

21   we sought to amplify in our review, those were documents that,

22   whether or not the government trusts Mr. Rodriguez-Jimenez,

23   those documents prove beyond a shadow of a doubt what he was

24   saying as regards various criminality.  I'm not going to go

25   over the point-by-point recitation, but as your Honor noted at

I8EHRodS

```
1     the top, and I'm sure your Honor read the submission, it's
2     substantial and, as the government put it, significant
3     information.  Most, perhaps, important as regards the
4     defendant's intention -- and we tried to lean on this in our
5     letter and I would like to repeat it at the risk of being
6     repetitive today -- is the defendant's offer to turn in his own
7     younger brother who by your Honor's, I'm sure, thorough
8     analysis of the PSR was the main drug mover in this case and
9     remains a fugitive.
10           It's a really strange thing to me that, as I said at
11    the top, in a scheme where we require evidence to make our
12    conclusions in courts, that there is traditionally and in this
13    case specifically no evidence about, again, anecdotally or in a
14    social science sense, why a certain time is sufficient rather
15    than greater than necessary.  I know it's not susceptible to a
16    precise analysis.  Every case is different.  Every person's
17    different.  It's difficult to say.  But certainly, if I were
18    sitting where your Honor were sitting, if I was being asked to
19    impose this amount of time on a first-time nonviolent offender,
20    a man who stands before this Court with no mandatory minimum,
21    with acknowledgment of his criminal activity, there should be
22    something you can point to and say, Look, if I give him this
23    sentence, this will be the result.  Other than our own
24    personalities which we bring to bear on that question, there
25    really is nothing.
```

I8EHRodS

1           So when we analyze the undisputed facts, without again

2      disputing the seriousness of the conduct, the sentence that the

3      government's asking for is just patently ridiculous.   That

4      sentence should be reserved for only the most violent people,

5      only the people directly convicted of narcotics offenses at the

6      highest level.   And even then, if they were nonviolent, I would

7      submit that there would be a problem for that kind of sentence

8      for a first-time 48-year-old man when your Honor, I know, takes

9      into account the significant, in the government's words,

10     information that the defendant provided; the fact that there

11     are all these dozens of letters attesting to his character; the

12     fact that he has the intelligence to be rehabilitated which,

13     after all, is another one of the factors of 3553(a).   We submit

14     to you that a sentence far, far below, one in the range that we

15     advocated in our submission, is the appropriate sentence to

16     conform to 3553(a)'s requirement of sufficient but not greater

17     than necessary.

18           THE COURT:   All right.   Thank you.

19           Mr. Rodriguez-Jimenez, would you like to address the

20     Court before sentence is imposed?

21           THE DEFENDANT:   Yes.

22           THE COURT:   Yes, you can certainly turn that

23     microphone towards you.   Thank you, sir.

24           MR. VALENCIA:   Your Honor, do you want

25     Mr. Rodriguez-Jimenez to stand?

I8EHRodS

```
1         THE COURT:  Whatever you're most comfortable doing.
2    Sometimes people are.  It's nice if you stand, but if it's more
3    comfortable to sit, I will take no offense.
4         THE DEFENDANT:  Well, initially, I would like to say
5    that I know that nothing I say here is going to change the
6    decision that your Honor decide to make.
7         THE COURT:  Well, let me just also say that I always
8    listen to what the defendant has to say prior to making an
9    ultimate sentencing determination.  That is part of what I take
10   into consideration as a totality of facts and considerations in
11   my determination.
12        THE DEFENDANT:  Thank you.
13        I would like to express to you that I am very aware of
14   the wrongdoing I have committed.  I have been able to see how
15   far-reaching these crimes have gone.  And I would just like to
16   say that if you allow me to reintegrate myself into society and
17   work for myself and my family, I will not commit any other
18   criminal acts.  And I'd just like to say that I have the desire
19   and the strength to reintegrate myself into society and to
20   achieve the goals that I had before getting into this trouble.
21   That is it.
22        THE COURT:  Thank you.
23        THE DEFENDANT:  Thank you.
24        THE COURT:  Thank you.
25        All right.  Mr. Falk, you're looking at me
```

I8EHRodS

expectantly.  Is there something else?  Normally, I just have

the defendant say the last word and have you comment before

that.  Is there something you feel you wanted to say?

        MR. FALK:  I understand, your Honor.  I would just

like to respond very briefly to some of the items that Mr. Cohn

raised if you'll permit me.

        With respect to his assertions that Mr. Rodriguez is

completely nonviolent, I think that that's belied by the

description of the conduct that's contained in our letter with

respect to his codefendant Sergio Urbina.  Whether or not that

was specifically violent behavior, the occurrence that happened

with respect to Mr. Urbina was certainly backed by the threat

of violence, and I think it's only a matter of luck that

Mr. Urbina was able to escape that situation intact, given that

he was essentially kidnapped by the defendant.

        THE COURT:  Let me just say this so that it is

absolutely clear that there is no factual dispute that is

meaningful to the Court's imposition of a sentence so that we

don't need a *Fatico* hearing on this issue.  It is not important

to the Court's decision that there has been any violence.  I am

willing to accept and I do accept for purposes of the

sentencing proceeding that Mr. Jesus Rodriguez-Jimenez is a

nonviolent individual.  I understand the government's point

that they believe they have information on it; however, that

would be disputed by the defense and therefore could create a

I8EHRodS

1    factual issue.

2              I don't think there's any reason for me to need to go

3    there.  What I am really focused on is the money laundering,

4    both the concealment and the transaction, both Counts One and

5    Counts Two -- sorry, Counts One and Counts Three, there are two

6    counts, not on that conduct.  So I appreciate your reference to

7    it.  I should tell you that I am going to ignore that

8    situation.

9              MR. FALK:  Thank you, your Honor.

10             With respect to another reason why a significant

11   sentence is warranted here, the defendant says if he gets out,

12   he will be reintegrated into society.  Let me just say that the

13   government is aware that the defendant's money laundering

14   operation and network is still intact to a certain extent, and

15   from our perspective, what an insignificant sentence would mean

16   is that the defendant would be back doing the very same thing

17   that got him here in the first place in very short order.  So

18   that is another reason that we feel that a significant sentence

19   is warranted in this case.

20             Finally, with respect to the significant information

21   provided by the defendant, we agree that he provided voluminous

22   information.  However, the usefulness of that information, as

23   pointed out in our sentencing submission, is dubious at best

24   given its source.  That includes documents that were provided

25   by the defendant.

I8EHRodS

1              THE COURT:  All right.

2              MR. FALK:  Thank you.

3              THE COURT:  Let me again, I just want to repeat one

4     thing, which is I am not concerned here today with the reasons

5     why the government chose not to give the defendant a

6     cooperation agreement.  The government always has the

7     unilateral ability in its own prosecutorial discretion to

8     choose with whom it wants to engage in a back-and-forth and

9     cooperative endeavor, and the government here chose that it was

10    not going to exercise its prosecutorial discretion.

11             I also accept, however, I just want to repeat this,

12    that the defendant did, in fact, proffer on a number of

13    occasions.  I also accept that there was a variety of

14    information that, had the government wanted to pursue a

15    cooperation agreement, could have been useful and may still

16    have been useful.  That's part of what a proffer does.  It

17    sometimes presents the government with useful information which

18    does not result in a cooperation agreement.  That's one of the

19    ways in which that process works.  There are no guarantees as

20    part of the back-and-forth proffering.

21             Just to make it absolutely clear, the Court's

22    sentencing determination does not take into consideration or

23    depend upon the reliability, or lack of reliability, in terms

24    of what the government has proffered.  I will accept what the

25    defense has said in terms of there was substantial information

I8EHRodS

1   provided to the government.  That doesn't change the fact that

2   the government did not choose to give a cooperation agreement.

3   That, in the Court's view, eliminates any issue with regard to

4   the timing of this proceeding and whether or not there's any

5   need to delve into reliability or lack of reliability or things

6   of that nature.

7         All right.  Mr. Cohn.

8         MR. COHN:  Your Honor covered 90 percent of what I

9   wanted to respond to, but the other 10 percent is Mr. Falk says

10  that there's criminal activity that is going on out there, and

11  he believes that means the defendant would rejoin that

12  activity.  There's no evidence to support that.

13        THE COURT:  All right.  Let me, then, go to what my

14  sentencing determination, the basis for it is.  Certainly, I am

15  a very committed believer to the Court always setting forth its

16  sentencing determination and its rationale, and I've done that,

17  I hope, in every sentencing proceeding and will do it here.

18        The Court is required to take into consideration the

19  sentencing guidelines.  That's one of the things that a judge

20  is always required to take into consideration.  I am not bound

21  by the guidelines here in terms of being required to impose a

22  particular sentence.  The guidelines are advisory only.  In

23  this particular situation, neither Count One nor Count Three,

24  the two counts of conviction, neither count carries any kind of

25  mandatory minimum sentence.  Therefore, I have discretion to

I8EHRodS

1    determine what the appropriate sentence is.

2            With that said, the Court does look at the guidelines

3    as presenting a potentially reasonable sentence.  It is up to

4    me then, in applying the various sentencing factors under

5    3553(a), to determine whether, in fact, the guidelines for the

6    circumstances here and the defendant's own history and

7    characteristics here merit such a sentence.  But I will say

8    that, in general, I am of the view and have been of the view

9    since 2011 that the guidelines are, in fact, a useful tool for

10   the Court.  While I understand there is a great deal of debate

11   about the guidelines, I am of the view that they assist the

12   Court and courts across the country in reducing sentencing

13   disparities.  That does not mean that I or anybody else should

14   accept the guidelines as necessarily setting forth what is

15   appropriate for a particular defendant for a particular set of

16   circumstances, but it is indicative of my view that they are

17   useful.

18           With that said, ultimately, what I have to do is focus

19   on language that Mr. Cohn referenced, which is what kind of

20   sentence would be sufficient, but not greater than necessary,

21   for a particular defendant for a particular crime.

22           There are a variety of factors that the Court has to

23   analyze in making that determination.  The federal sentencing

24   3553(a) factors guide the Court.  I have to look at the nature

25   and the circumstances of the offense.  How serious was the

I8EHRodS

offense?  What was the offense doing to our community or

communities, whether it's a community writ large in terms of

the country, in terms of certain specific communities?  What

was happening?  Why was the defendant engaged in that offense

in terms of the offense itself?  That goes to his history and

characteristics.  What do I know about him in terms of why he

did it and whether or not there's any likelihood that he would

do it again, and whether I think there needs to be a portion of

the sentence or an entirety of the sentence that will speak to

something that we call personal deterrence.  It can also be

taken as incapacitation under certain circumstances.

Deterrence, personal deterrence, can be short term or it can be

longer term, depending upon one's judgment of character.

          In addition to that, one looks at issues such as

general deterrence.  Does a particular sentence indicate to

others that might be inclined to engage in such conduct that

this particular conduct will be treated with a particular level

of seriousness, which will assist us as a society in generally

deterring the conduct here or similar conduct that would be

like it?

          I also have to look at what is a just sentence, what

type of sentence will promote respect for the law; whether

there are any educational, medical, correctional, or vocational

treatment indicated by a particular sentence.  And ultimately,

again, we're always coming back to what is a sufficient, but

I8EHRodS

1    not greater than necessary, sentence.

2           I also in this kind of case take into consideration

3    whether other sentences for other codefendants are somehow

4    indicative of what a sentence that would be just here would be.

5    I would note that Mr. Urbina who was referenced in the defense

6    submission stands in a very different set of circumstances from

7    this defendant, both in terms of his level of involvement and

8    his position in the overall organization, and then the fact

9    that Mr. Urbina pled guilty pursuant to and was sentenced

10    pursuant to a cooperation agreement.  Mr. Urbina did not have a

11    set of circumstances that is similar to this defendant, so he

12    was given a particular sentence that reflected his

13    characteristics as a person, as well as the nature and the

14    circumstances of his involvement in the offense.

15           Let me then go back to what we have here in terms of

16    my analysis of these factors.  This was an incredibly serious

17    two offenses.  They're separate crimes of conviction.  The law

18    treats each crime of conviction separately.  They carry

19    separate penalties, and they have separate indications as to

20    the type of criminal conduct that is being addressed by each of

21    them.

22           Here, we have an individual, Mr. Jesus

23    Rodriguez-Jimenez, who was a major money launderer for

24    narcotics traffickers, to the tune that we know of, of

25    $284 million.  That's $284 million of money laundering that at

I8EHRodS

least in part, and in significant part, was associated with

narcotics trafficking.  There may have been other forms of

unlawful activity, but certainly narcotics trafficking was a

very significant part of that.

         We know that narcotics-trafficking organizations, to

focus on that aspect of it, require in order for them to

succeed that there be ways in which the funds, the money that

is obtained from narcotics trafficking, can be laundered so

that the narcotics traffickers can then utilize those funds

with lessened risk.  That is part of what makes the machinery

of narcotics trafficking go around.  We know that narcotics

traffickers do not engage in narcotics trafficking just for the

fun of it.  They engage in it as a business.  These are

large-scale traffickers, and that part of the business requires

a banking operation, and Mr. Rodriguez-Jimenez was a banking

operation for a large-scale set of narcotics trafficking that

is laid out in the PSR.

         The conduct here, the seriousness of the conduct, is

underscored not only by the very, very significant dollar

amount that is associated with it but also with how brazen the

conduct was.  What is set forth in the PSR is really conduct

which is breathtaking in how brazen it was.

         Mr. Rodriguez-Jimenez kept records of his conduct,

detailed, detailed records of the money flow and of the way in

which his organization was running funds.  And it was

I8EHRodS

1    complicated.  It was done through a variety of fronts that were

2    assisting with this, and it is a level, magnitude of money

3    laundering and conspiracy to engage in monetary transactions in

4    criminally derived property, both of those crimes, that is

5    incredibly serious and needs to be treated with a level of

6    seriousness commensurate with that from the Court.

7           I do note and have kept in mind and have given a great

8    deal of consideration to the number of proffer sessions that

9    the defendant had with the government.  That is always of

10   significance to the Court and is so here.  There are, however,

11   a number of reasons why the government may or may not choose,

12   ultimately, to sign a defendant up as a cooperator.  What is

13   important to me is that, ultimately, this defendant is not

14   being signed up as a cooperator.  He is being sentenced today

15   for his conduct, and it is up to me to determine whether or

16   not, assuming that he was being truthful in his cooperation,

17   whether or not that cooperation would indicate a particular

18   sentence that is of such a low level as requested by the

19   defense or something else.

20          It is worth, then, pausing on the reasons why

21   individuals and, in particular, I believe,

22   Mr. Rodriguez-Jimenez, the characteristics displayed overall in

23   the PSR, why it does not necessarily indicate to me a dramatic

24   change of heart.  I also should say against this I'm mindful of

25   all of the letters of support for Mr. Rodriguez-Jimenez.

I8EHRodS

1    Cooperation agreements are often a reasonable desired outcome

2    for a defendant looking at what is otherwise an incredibly

3    serious sentence.  It can often be a very rational decision to

4    try to cooperate with the government to get a sentencing

5    reduction.  It does not mean, as a defense attorney who tried

6    several cases in front of me used to say on cross-examination,

7    that proffering with the government and giving information to

8    the government is a car wash for the soul.  It doesn't

9    necessarily mean, in other words, that a defendant by

10   proffering, even proffering truthful information, which I

11   accept here occurred, it does not mean that the defendant does

12   not remain an individual who would revert to criminal behavior

13   if given the opportunity.

14          What it does indicate is that there are very few tools

15   in the toolbox to obtain a lower sentence.  That is one of

16   them.  Often it works; sometimes it doesn't work.  It didn't

17   work here.  In other words, cooperation, a cooperation

18   agreement, was not obtained here.  The government certainly

19   engages in cooperation agreements with sufficient frequency

20   that the Court does not take the lack of a cooperation

21   agreement here as some sort of irrational move by the

22   government.  The government, then again, just exercised its

23   unilateral prosecutorial discretion.

24          So from my perspective, I can assume that the

25   defendant proffered, that he cooperated, that he gave truthful

I8EHRodS

1     information, but I can still believe that that does not change

2     my overall analysis that he would nonetheless, given the scale,

3     the magnitude of the operation, the sophistication with which

4     the operation was run, the level of detail, the level of

5     organization that he had, it does not indicate to me that he

6     necessarily is suddenly going to change his ways.

7            My sentence, and as I think about also the history and

8     characteristics of Mr. Rodriguez-Jimenez, my sentence needs to

9     account for what I believe, therefore, is a very significant

10    need for this sentence to indicate to Mr. Rodriguez-Jimenez

11    that this kind of conduct is over, that his participation in

12    this criminal organization is at an end, that it's at a

13    long-term end, that it should not and will not go on, that will

14    have, at least one would hope, a significant impact on the

15    organization, given the level of Mr. Rodriguez-Jimenez.

16           Of course, there are always often others who will try

17    to fill the void, but it does appear that Mr. Rodriguez-Jimenez

18    had particular skills in his organizational abilities and his

19    abilities to run large-scale organizations that will mean that

20    when he is taken off the streets, as he has been, that there

21    will be an impact.  Therefore, the personal deterrent aspects

22    of the sentence are of some significance.

23           The Court also believes that, given the magnitude of

24    the sentence, given the magnitude of the sentence, there will

25    also be a general deterrent aspect to it.  In other words, that

I8EHRodS

1    the conduct here was of a nature that needs to be treated with

2    great seriousness.  And others who might be likely to engage in

3    such conduct or may be engaging in it now, indeed may be

4    fulfilling Mr. Rodriguez-Jimenez's role today for him, in place

5    of him in a similar organization or even the same organization,

6    will understand that this kind of crime will carry a very, very

7    serious sentence.  So there is a way in which this sentence

8    will carry a general deterrent purpose as well.

9            I should say that, given the way in which this

10   organization was run, it is essential for the Court to send a

11   very serious message, and I would expect that word would get

12   out.  In other words, I would expect that the wide-sweeping

13   individuals who may continue to be involved in this kind of

14   organization, the broad group of individuals, will learn of

15   this sentence and will hear of it; and, therefore, that the

16   general deterrent purpose that the Court intends to be filled,

17   in part by this sentence, will, in fact, occur.

18           So I do think of this sentence as having a personal

19   deterrent aspect, a general deterrent aspect of recognizing the

20   seriousness of the offense and of doing justice to the crime

21   which occurred here, and that is, the crime is not only the

22   crimes of conviction but ultimately having an impact on

23   narcotics traffickers who will understand that at least a

24   portion of their organization that they rely upon generally, if

25   it is found and recognized and able to be prosecuted, will be

I8EHRodS

1     dealt with with the utmost seriousness.

2              Accordingly, under all of the factors of 3553(a),

3     taking into consideration the offenses of conviction, which

4     again I take as two separate offenses, and also recognizing the

5     history and the characteristics of this particular individual

6     before me, having read all of his letters and having recognized

7     his attempts at proffering with the government, it is my very

8     carefully considered judgment that a sentence at the statutory

9     maximum for each of the two counts of conviction is sufficient,

10    but not greater than necessary, here.  That is, Count One

11    carries a maximum sentence of ten years' imprisonment.  That's

12    120 months.  Count Three carries a separate 20-year sentence,

13    that is 240 months.  It is my intent to pronounce a sentence

14    for those two counts of conviction, and the sentences imposed

15    will run consecutive to one another.  That is 120 months on

16    Count One and 240 months on Count Three.  That is for a total

17    of 360 months, or 30 years' imprisonment.

18             I am not going to impose a separate period of

19    supervised release because the defendant will be deported.

20    Therefore, supervised release, from the Court's perspective,

21    ultimately is unnecessary.

22             I do, however, impose a $200 mandatory special

23    assessment.  There is also a consent order of forfeiture in the

24    amount of $284 million, and the Court does order forfeiture in

25    the amount and on the terms that have been consented to.  I

I8EHRodS

1    have signed the order of forfeiture.

2           The Court is not going to impose restitution.  There's

3    no separate restitution being sought.

4           I'm not going to impose a separate fine.  I do

5    acknowledge that probation had sought a separate fine.

6    However, the Court does not view the fine as particularly

7    useful here given the magnitude of the forfeiture order.

8           Let me just say that the possibility of this duration

9    of a sentence was specifically discussed at the plea.  I took

10   the plea myself, and I review and always review very carefully

11   during the plea, during pleas, what this could mean.  That

12   there would, for instance, be the possibility of this kind of

13   sentence being imposed.

14          Indeed, when reviewing the appeal rights that are

15   waived, the Court always pauses in particular, I always

16   personally pause in particular on what is being waived.  Here,

17   there was a waiver of any appeal or seeking a sentence

18   modification of any sentence that is up to and including the

19   360-month sentence that I have imposed.  Accordingly, I just

20   want there to be an acknowledgment on the record that the plea

21   transcript should also be reviewed in connection, as of course

22   it would be, if there's any appeal taken.

23          Is there any legal or other reason why sentence should

24   not be imposed as stated, Mr. Falk?

25          MR. FALK:  No, your Honor.

I8EHRodS

<pre>
 1              THE COURT:  Mr. Cohn?
 2              MR. COHN:  Apart from what's already been said in the
 3   record, no, your Honor.
 4              THE COURT:  All right.  The Court does impose sentence
 5   as stated.
 6              Now, having imposed the sentence, I will say that
 7   there are also -- I believe there's an open count, Mr. Falk.
 8              MR. FALK:  Yes, your Honor.  We would move to dismiss
 9   that count.
10              THE COURT:  That count is dismissed, the open count.
11   I think it's only one count.  Count Two is dismissed.  Any open
12   counts are hereby dismissed.
13              Now, you have a right to appeal,
14   Mr. Rodriguez-Jimenez.  You've waived a number of appeal rights
15   in connection with your plea, but it's not my place to tell you
16   whether you have any bases for appeal.  It will be up to you to
17   determine whether or not you want to seek to appeal.  If you
18   do, you must file any notice of appeal within 14 days of the
19   filing of the judgment of conviction.  If you cannot afford the
20   cost of appeal, you can apply to have those costs waived.
21   That's called proceeding in forma pauperis, and you have a
22   right to proceed in that manner.
23              I say the appeal right because you have, as every
24   defendant has, a right to appeal.  I do note, however, that you
25   have waived your right to seek a sentence modification of any
</pre>

I8EHRodS

1   sentence within or below the 360 months that I have now

2   imposed.

3           All right.  Folks, anything further?

4           MR. FALK:  No, your Honor.

5           MR. COHN:  Your Honor, because the proceedings

6   discussed Mr. Rodriguez-Jimenez's cooperation, we'd ask that

7   the transcript be sealed.

8           THE COURT:  I am going to deny the sealing because

9   there was such a significant issue here as part of this

10  proceeding, there has been such a significant issue in

11  connection with whether or not the Court was giving appropriate

12  attention to this.  The duration of the sentence is significant

13  enough.  The details of the cooperation, that letter shall

14  remain under seal.  I have specifically not gone into the

15  entire array of details.  Therefore, what it means and what

16  kind of significance it may have to anyone, I think, shall

17  remain under seal.  However, this transcript shall not.  We've

18  been quite careful.

19          Thank you.  We're adjourned.

20          (Adjourned)

21

22

23

24

25